### In re CHAMBERLAIN.

(District Court, N. D. New York. July 25, 1910.)

1. BANKRUPTCY (§ 414*)—DISCHARGE—SPECIFICATIONS OF OBJECTION—FALSE OATH.

Evidence in aid of specifications of objection to a bankrupt's discharge on the ground that he had made a false oath in and in relation to his proceedings in bankruptcy *held* insufficient to establish the making of certain of the false statements alleged.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 414.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. BANKRUPTCY (§ 408*)—DISCHARGE—OBJECTIONS—FALSE OATHS.

> Where certain creditors of a bankrupt claimed that they had been induced to extend credit by reason of the bankrupt's false representations as to his property, but they waived the tort and filed their claims against the bankrupt's estate, which were allowed, the bankrupt's denial under oath during his examination in the course of the bankruptcy proceedings that he had made such statements, even if false, was immaterial to any issue or question in the bankruptcy proceeding, and was therefore no ground for denying his discharge on the ground that he had made a false oath in and in relation to the proceeding in bankruptcy.

> [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–734; Dec. Dig. § 408.*]

In the matter of Walter W. Chamberlain, bankrupt. On motion to confirm the report of a special master overruling specifications of objections to the bankrupt's discharge, and recommending that a discharge be granted. Motion allowed.

A. F. Saunders and Geo. W. Reeves, for bankrupt.

A. L. Chapman, for objecting creditor.

RAY, District Judge. Section 14 of the bankruptcy act provides that:

> "The judge shall hear the application for a discharge and such proofs and pleas as may be made in opposition thereto by parties in interest * * * and investigate the merits of the application and discharge the applicant unless he has (1) committed an offense punishable by imprisonment as herein provided. * * *" Act July 1, 1898, c. 541, 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427).

The objections here are that the bankrupt has committed such an offense, viz., that such bankrupt "knowingly and fraudulently," when under examination at a meeting of his creditors held in the bankruptcy proceedings, made a false oath in and in relation to such proceeding in bankruptcy; that is, that he had committed the offense specified in subdivision "b" (2) of section 29 of the bankruptcy law. The specifications are that when examined at a meeting of creditors in his bankruptcy proceedings the bankrupt knowingly and fraudulently testified under oath that he did not make certain oral representations as to his financial condition and property and ownership of property for the purpose of obtaining credit which certain creditors now testify he did make. It is alleged that on six or seven different occasions, not long prior to his bankruptcy, Chamberlain orally stated to the person of whom he desired to obtain credit and of whom he did obtain credit (there being seven such persons) for property sold or by indorsement that he owned or had an interest in property which he did not own. The statements alleged to have been made differed substantially in each of the cases. If made, they tended to show that Chamberlain was going about and obtaining credit for property sold him or obtaining the indorsement of his paper by making false statements orally as to his financial condition. At the time Chamberlain was examined, these creditors had proved their claims in bankruptcy, respectively, as for an ordinary debt, waiving the tort if any. He was asked if he made such and such statements and denied making them. There was no pretense

or claim he then had the property or was concealing it, etc. Having denied making the statements, and having applied for a discharge, specifications of objections were filed charging that he had knowingly and fraudulently made a false oath in or in relation to the proceeding in bankruptcy. It was entirely immaterial to the bankruptcy proceedings, or any issue or question therein, whether or not Chamberlain made the representations except as it bore on his methods of doing business and general character. If the questions were asked as a basis for impeachment, they were on collateral matters and his answers were conclusive. There was no pretense the statements were made in writing.

In all but two instances, as the special master finds and as the record discloses, it was oath against oath as to each alleged transaction, and the special master says that the commission of the offense was not proved. In two of the cases the special master finds that Chamberlain did make the representations alleged, but also says that he is not willing to find that Chamberlain made a false oath in relation to any proceeding in bankruptcy. One of these statements relied on was made, it is alleged, to one Mrs. Maxwell, January 28, 1909, and she says Chamberlain told her he would like a couple of cows for his dairy, and could pay the note (which he gave for the cows) with money that was coming from the dairy. He got the cows. In the bankruptcy proceedings (Mrs. Maxwell having proved her claim and procured its allowance) how was it material whether Chamberlain did or did not make the statement alleged? How could it affect the proceeding or any question arising therein? No question, so far as appears, did arise in that proceeding in which his making or not making that statement to Mrs. Maxwell had the slightest materiality or on which it had the slightest bearing. True, it related to his prior dealings with one of his creditors and the transaction with her in which he became her debtor.

Clause 9 of section 7 of the bankruptcy act requires the bankrupt to submit to an examination concerning the conducting of his business, the cause of his bankruptcy, his dealings with his creditors and other persons, the amount, kind, and whereabouts of his property, and, in addition, all matters which may affect the administration and settlement of his estate. It is asserted that the questions and answers referred to in answer to which it is claimed the false statements were made related to and constituted a specific matter in regard to which the creditors had a right to inquire fully, and in regard to which the bankrupt was required to answer fully and truthfully, inasmuch as the questions and answers involved directly his "dealings with his creditors." The contention is that this makes all his dealings with his creditors not only a proper, but a material, subject of inquiry, and that, being a material subject of inquiry, false statements as to what occurred are presumed to have been fraudulently made, made with a purpose to deceive, mislead, and defraud the creditors or some of them of their rights. There is force in this contention. However, this objection to the discharge of the bankrupt charges a crime, and, while the objector is not bound to prove his allegation beyond a reasonable

doubt, he is bound to prove the same by "clear and convincing testimony." In Re Howden (D. C.) 7 Am. Bankr. Rep. 194, 111 Fed. 723, 725, Judge Coxe, now of the Circuit Court of Appeals, said:

"The authorities are unanimous in holding that the burden is on the opposing creditor to prove his objection, not necessarily beyond a reasonable doubt, but by clear and convincing testimony."

This is quoted and approved by the Circuit Court of Appeals, First Circuit, in Re Troeder, 17 Am. Bankr. Rep. 723, 150 Fed. 710, 80 C. C. A. 376, where it was also held:

"A creditor, opposing a bankrupt's discharge, because of the alleged commission of offenses punishable under section 29b, need only establish his allegations by evidence that is clear and satisfactory. On such hearing, the question is not as to the general truthfulness of the bankrupt, but as to some specific matter which can be framed into an issue material to his bankruptcy."

Now, I do not see how the matter of the purchase of these cows of Mrs. Maxwell and the representations made to her could have been framed into an issue material to the bankruptcy of Chamberlain. It was conceded that he got the property, and did not pay therefor. The claim was proved by Mrs. Maxwell and allowed by the referee. She did not assert fraud, and Chamberlain's fraudulent representations in incurring the debt were not in issue or question in the bankruptcy proceeding. As said by the Circuit Court of Appeals in Re Troeder, supra: "On such hearing the question is not as to the general truthfulness of the bankrupt." So far as the bankruptcy proceedings were concerned, it was utterly immaterial what representations the bankrupt made as to how he could pay the note given Maxwell or from what fund. I do not see how I can hold on this record, in face of the findings of the special master who saw and heard the witnesses and noted their manner, etc., and of the authorities cited, that Chamberlain "knowingly and fraudulently" made a false oath in or in relation to any proceeding in bankruptcy within the meaning of the bankruptcy act. The special master has declined to find that he did.

Now as to the transaction with Kennedy. On his examination in the bankruptcy proceedings Chamberlain was asked: "On the occasion when Edwin Kennedy indorsed the note for you did he ask you if you owned one-third of the farm or that in substance?" The bankrupt answered, "He did not." He was asked, "Did you say you owned one-third of the farm, or that in substance?" He answered, "No, sir." He was also asked, "Did you make any reference to what property you owned?" He answered, "No, sir." Also: "Q. He did not ask you anything of that kind in any way, shape, or manner?" The answer was, "No, sir." It is alleged in the specifications of objections that in so testifying Chamberlain was guilty of knowingly and fraudulently making a false oath in or in relation to a proceeding in bankruptcy. There was no claim or pretense that the bankrupt did own a third interest or any interest in the farm, the one he was on. The questions were not directed to an attempt to prove the bankrupt did own an interest in the farm at the time of the transaction with Kennedy, or that he had transferred any interest therein in fraud of creditors or as a preference. The object was to show he had procured Kennedy to

indorse his note by the oral, false representations that he did own such an interest in the farm when he did not.

On the hearing before the special master on the objections to a discharge, Kennedy was called as a witness, and testified that February 5, 1909, he indorsed a note for Chamberlain at his request in Balch's blacksmith shop, and that Fred Balch was present, and that, before the note was indorsed, "I asked him if he owned a third of the farm, and he said he did and two horses and twelve cows. He said it wouldn't make me any trouble, and that, when this note was due the 5th of May, he would pay it. He said he was good for the amount and had a chance to buy cows at reasonable prices and had plenty of hay." Kennedy was compelled to pay the note, and in the bankruptcy proceedings proved his claim on the note and had it allowed. Kennedy was 71 years of age, is and had been hard of hearing since he came out of the Civil War, and is drawing a pension of $22 per month for deafness. On cross-examination he was asked, "Suppose you drop it now," referring to his ear trumpet. "I can speak louder. Is your hearing any better than it was last February?" His answer was, "I do not understand; yes, he is a farmer." He did not have his hearing apparatus at the time of the conversation about the note and property in the shop. He also testified on his cross-examination as to this transaction, "Q. You indorsed his note? A. Yes. Q. Did you know he owned the farm? A. He told me his mother owned it." Fred Balch, the blacksmith, was called to corroborate Kennedy, and his testimony was as follows:

"What, if anything, did you hear on that occasion with reference to Chamberlain's financial condition? A. He said that— "Q. Who said? A. Mr. Chamberlain, that he owned one-third of the farm, or something. I was pounding on the anvil. I did not understand the last end of what it was."

On cross-examination he said that he could not hear Kennedy talk or what he said, but heard Chamberlain say "he owned one-third of the farm," and that there was more said which he could not hear. Now, Kennedy said he asked Chamberlain if he owned a third of the farm and Chamberlain said he did. Kennedy and Balch put different words in Chamberlain's mouth, and Balch was pounding on the anvil so he could not hear Kennedy at all, and Kennedy was very deaf. I do not think the charge of knowingly and fraudulently making a false oath is sustained by this evidence. The evidence is not clear, convincing, and satisfactory. First. Kennedy was an old man and quite deaf, and did not have his hearing apparatus. Second. Balch was pounding on his anvil and could not hear Kennedy at all, and only heard one sentence used by Chamberlain. Third. Kennedy says Chamberlain told him his mother owned the farm. The contradictions between Kennedy and Balch, both contradicted by Chamberlain, together with the deafness, the absence of the hearing apparatus, the pounding on the anvil, and the interest of Kennedy and his admission that Chamberlain told him his mother owned the farm, leaves the mind in grave doubt as to what was actually said. It cannot be fairly said the evidence clearly preponderates in favor of Kennedy. However, seven wit-

nesses testify that Chamberlain made untrue statements as to his financial condition for the purpose of obtaining credit at about this time, but this does not prove that he stated to Kennedy that he owned a third interest in the farm, and knowingly and fraudulently made a false oath when at a later time he testified he did not so state. It is not claimed he made any such statement or similar statement to any other person. In regard to this alleged statement, I do not see how any issue material to the bankruptcy proceedings could have been made or raised. If the object was to obtain an admission from Chamberlain to use against him in a civil suit for obtaining property of these various persons or one or more of them by false and fraudulent representations, it was clearly immaterial to the proceedings in bankruptcy. The examination of the bankrupt is not properly used for such a purpose. These inquiries threw no light on the amount of his property or its value, or the proper mode of administering his estate, or the disposition he had made of his property, and no one was seeking to reclaim the property from the estate on the ground of fraud. They threw no light on the question whether or not he would be entitled to a discharge, as section 14 of the act provides that to bar a discharge the bankrupt must have (3) "obtained property on credit from any person upon a materially false statement in writing made to such person for the purpose of obtaining such property on credit." However, inasmuch as the special master has refused to find that Chamberlain knowingly and fraudulently made a false oath when under examination in the bankruptcy proceeding in denying that he made the statements which the special master finds he did make to Kennedy and Mrs. Maxwell, and I am not satisfied that he did, I think the report and findings of the special master should be confirmed, and it follows that a discharge will be granted. I am far from satisfied that Chamberlain was or is a strictly honest man, or that he had dealt squarely and fairly with these creditors, but the grounds of refusing a discharge in bankruptcy are statutory and limited, and do not cover general dishonesty or unfair and sharp dealing with creditors, or oral misrepresentations made in obtaining property on credit, or even false oaths unless they relate to matters material to the bankruptcy proceedings. See cases cited and Bauman v. Feist, 5 Am. Bankr. Rep. 703, 107 Fed. 83, 46 C. C. A. 157.

The report of the special master is confirmed and a discharge granted.